# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

JEANNE BENNETT, Administrator of,    )
the Estate of Michael Manos, Deceased,    )
                                        )
           Plaintiff,          )
                                          )
v.                                )       Case No. CIV-17-289-SPS
                                          )
CARTER COUNTY BOARD OF        )
COUNTY COMMISSIONERS; CHRIS   )
BRYANT, Sheriff of Carter County, in   )
his official capacity; MILTON         )
ANTHONY, in his individual capacity;  )
JOSH ADAMS, Deputy; and         )
BRANTLEY MAXSON, Deputy;      )
                                          )
          Defendants.      )

## OPINION AND ORDER

This case arises out of Michael Manos's arrest, conviction and subsequent treatment at the Carter County Jail in Ardmore, Oklahoma. Mr. Manos is deceased, so the Plaintiff is his mother Jeanne Bennet, who is also the administrator of his estate. The Plaintiff sued a number of individuals and entities, including the remaining Defendants in the case, Chris Bryant, in his official capacity as the Sheriff of Carter County, Oklahoma; Milton Anthony, former sheriff, in his individual capacity; and deputies Josh Adams and Brantley Maxson, in their individual capacities. The claims against these Defendants are made pursuant to 42 U.S.C. § 1983, and all have filed summary judgment motions. In accordance with its decisions announced on March 29, 2019, *see* Docket No. 240, the Court issues this opinion setting forth its reasons for: (i) granting the Motion for Summary Judgment of Defendant,

Deputy Brantley Maxson [Docket No. 172], the Motion for Summary Judgment of Defendant Milton Anthony and Brief in Support [Docket No. 194] and Motion for Summary Judgment of Defendant Josh Adams and Brief in Support [Docket No. 195]; and, (ii) denying Defendant Sheriff Chris Bryant's Motion and Brief for Summary Judgment [Docket No. 182].

## I. Procedural History

The Plaintiff filed this case on July 25, 2017, in this Court. In her Second Amended Complaint, Plaintiff alleged three causes of action against the various Defendants, but only the first and second implicate these four defendants.[1] The Plaintiff's First Claim for Relief is raised pursuant to 42 U.S.C. § 1983 as to all four Defendants, alleging violations of the constitutional right to medical care and mental health care as to Defendants Adams and Maxson, and based on a policy or custom, as well as failure to train and failure to supervise as to Defendant Former Sheriff Anthony in his individual capacity and Defendant Sheriff Bryant in his official capacity. The Second Claim for Relief is raised pursuant to § 1983 as to Defendants Adams and Maxson, alleging violations of the constitutional right to humane conditions of confinement.

## II. Law Applicable

Summary judgment is appropriate if the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "there is sufficient

---

[1] The Plaintiff's Third Claim for Relief arising under Oklahoma law has been dismissed with prejudice. *See* Docket No. 147.

evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party must show the absence of a genuine issue of material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), with the evidence taken in the light most favorable to the non-moving party, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). However, "a party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or . . . showing that the materials cited do not establish the absence or presence of a genuine dispute[.]" Fed. R. Civ. P. 56(c).

### III. Factual Background

The undisputed facts[2] reflect that beginning October 22, 2015, Manos was at the Carter County Jail serving a four-month sentence for assault and battery. When Anthony became sheriff, a policy and procedure manual was already in place, and he delegated training to Jail Administrator Michael Armstrong. Armstrong has no recollection of providing these policies to Jail staff from 2013 through 2015. Jail policy at all relevant times stated that medical care was to be delivered by a licensed physician and through the use of trained health care personnel. *See* Docket No. 183, Ex. 1 at p. 4. Likewise, all detention officers were to be trained in emergency first aid and cardiopulmonary

---

[2] The Plaintiff's four Responses to Defendants' summary judgment motions contained numbered statements corresponding to those set forth by the Defendants, but only a few contained the requisite "Admit/Deny" language and largely asserted additional facts without commenting on whether Plaintiff admitted or denied Defendants' statements. The Court notes that such an approach is in contravention of Fed. R. Civ. P. 56 and this Court's own Local Rule 56.1(c), which requires that "[e]ach fact in dispute shall be numbered, *shall refer with particularity to those portions of the record upon which the opposing party relies*, and if applicable, shall state the numbered paragraphs of the movant's facts that are disputed." [emphasis added].

resuscitation ("CPR") with updated yearly training. *Id.* However, Carter County Jail had no licensed physician on staff, and instead had hired licensed registered nurse Kim Miller. She did not regularly review medication logs, although she had access to the logs and the Jail Entry Log.

Manos had a history of mental illness, and upon his intake that day, a Medical Questionnaire indicated that he had high blood pressure and bipolar disorder. *See* Docket No. 183, Ex. 2. Furthermore, there were boxes checked indicating that he was currently under medical treatment and that he was currently taking medication prescribed by a doctor, but there were no further details on these two points because the "Explanation" section listed "n/a." *Id.* It is undisputed that Manos was prescribed a number of medications for impairments including high blood pressure, diabetes, and bipolar disorder. Upon his incarceration, the Plaintiff provided those medications to the jail.

Although there is some dispute about whether the jail would accept medications that had been opened, it appears the jail *did* accept at least some of Manos' medications because there is a medication log beginning October 22, 2015 for seven different medications. *See* Docket No. 183, Ex. 3. The Plaintiff challenges the veracity of these logs, asserting that there were discrepancies regarding pill count, and that logs were filled out prior to handing out medications to inmates. However, jailers testified that it was their process to fill out the logs, then have inmates initial or note "pass" when medications were accepted for refused. Based on the logs, Manos was fairly consistent in accepting his medications for

the first few days, but began passing on some or all of them beginning October 28, 2015. He also began refusing some or all of his meals, beginning October 30, 2015.

On October 27, 2015, Manos was moved to a holding cell following tensions with other inmates. The Carter County Jail policy for holding cells is that a deputy was required to observe each holding cell once per hour, or once every fifteen minutes if the inmate was suicidal or in need of medical observation. *See* Docket No. 183, Ex. 1, p. 1. Later that morning of October 27, jail staff moved Manos to cell A104, a medical cell where he was housed until November 7. The Carter County Jail has no separate specific policy for observance related to medical cells, but the general Jail policy requires documented hourly sight checks, as well as sight checks at least every half hour for inmates who were mentally or emotionally disturbed, identified as escape or suicide risks, or housed in disciplinary isolation. *Id.* at p. 3. The cells are under video surveillance, but that video footage was not preserved and is not part of the record in this case.

On October 29, 2015, Manos smeared feces on himself and his cell, and had to be forcibly removed and showered. Defendant Adams testified that, around this time, he saw Manos laying in his feces, that he had informed Nurse Miller and Jail Administrator Michael Armstrong about Manos' behavior, and that he had been told they were working on it. On November 3, 2015, Jail Administrator Armstrong called an ambulance for Manos because he had been eating his own feces, and apparently smeared feces on himself and his cell. When EMTs arrived, Manos was naked and handcuffed on the floor of the dayroom at the jail, because his cell had been flooded and water was coming from the toilet. The Prehospital Care Report states that jailers reported to the EMTs that Manos had not eaten

for five days (except for his own feces), and had also not had insulin for five days, and that he was "acting crazy." Docket No. 183, Ex. 6. Neither Maxson nor Adams was present for this event. The EMTs twice checked Manos' blood sugar, which was normal, and did not transport him to the ER. The report states, "carter co decided pt was faking his craziness and decided not to transport, but clean him up and keep him instead." *Id.* Deputy Johnny Denny signed a Refusal of Service for Manos. *See* Docket No. 183, Ex. 4.

After the EMTs left, Manos was taken to the showers and had to be assisted to get his backside clean, and was then returned to his cell, which had also been cleaned. Manos continued to refuse most, but not all, food and medications. On November 6, 2015, Judge Thomas Baldwin of the District Court of Carter County issued an order releasing Manos upon time served, with the stipulation that he only be released to his mother (the Plaintiff herein) and a friend, Michael Crawford, on the condition that she transport him to the Veteran's Administration Facility in Oklahoma City, Oklahoma. *See* Docket No. 182, Ex. 27. The Plaintiff has testified that she planned to pick him up on Sunday, November 8, 2015.

On November 7, 2015, around 4:30 p.m., Adams and Maxson were conducting a sight check and noted Manos lying on the ground, growling and mumbling to himself. An hour later, Maxson returned to dispense medications and asked Manos four times if he wanted to take his medications. On the fourth time, Manos replied, "No." Around 6:00 p.m., Maxson was passing out meal trays and Manos refused the dinner tray. He still had his uneaten lunch tray, which Maxson left in case Manos wanted it later. Adams picked up the meal trays, but left Manos' lunch tray after Manos said he would eat it "in a minute."

Around 8:50 p.m., Adams was passing out commissary, observed Manos lying on the floor close to the door, and asked Manos if he had eaten yet, to which Manos replied, "Not yet."

At 10:01 p.m., Maxson entered Manos's cell to ask if he wanted his medications, but could not get a verbal response from him even after tapping Manos' foot with his shoe. Maxson saw Manos' chest rise a few times, did not believe Manos was in distress, and continued with his medication pass. However, he began to suspect something was wrong with Manos and went to Adams with his concerns. They returned to Manos' cell and found him not breathing and with no detectable pulse; additionally, he had feces and urine smeared on him. Neither started CPR at that time. Adams went to the tower, and an ambulance was called at 10:10 p.m. Maxson relieved Deputy Corbin Whitener in the tower, and Whitener went to the cell to begin CPR; Adams also got two others to assist with CPR.

EMTs arrived around 10:16 p.m. and were escorted to the cell where officers were trading off performing CPR. The Prehospital Care Report from EMTs notes that officers were switching partners for CPR upon their arrival, and noted that the inside of the cell was covered in feces. Manos was removed out of the cell for easier access and EMTs began CPR. They attempted to intubate him, but were unsuccessful due to feces in Manos's mouth, and were unsuccessful after multiple attempts. Manos was transported to the hospital and pronounced dead at 10:48 p.m. His probable cause of death was listed as

pulmonary embolism, with diabetes and hypertension as significant contributing factors. Docket No. 208, Ex. 15.

At the time of this incident Maxson had been through two weeks of on-the-job training but had not received annual jailer training or first aid/CPR training but had previously been trained in CPR in 2008. Adams had a current certification in CPR training. Defendant Anthony (the sheriff at the time) had no interaction with Manos during the time he was incarcerated at the jail.

## IV. Analysis

Defendant Adams asserts that he is entitled to summary judgment because there is no evidence that he violated Manos's constitutional rights—either to medical care or humane conditions of confinement—and he is therefore entitled to qualified immunity. Defendant Maxson likewise asserts that there is no evidence he was deliberately indifferent to Manos' constitutional rights, and he is entitled to qualified immunity. Defendant Anthony asserts that Plaintiff cannot establish supervisory liability against him, and that he is therefore entitled to qualified immunity. Defendant Bryant, in his official capacity as the current sheriff, asserts that he is entitled to summary judgment because none of the jail employees violated Manos' constitutional rights, and furthermore, that no policy, practice, or custom at the jail caused a violation of his constitutional rights, that there is insufficient evidence of any alleged failure to supervise, and that the Plaintiff cannot identify a specific deficiency related to failure to train. The Plaintiff challenges all of these arguments, contending that the actions of Adams and Maxson constituted an underlying constitutional violation, that former sheriff Anthony is liable as a supervisor for constitutional violations,

and that current sheriff Bryant is liable in his official capacity and is therefore likewise not entitled to summary judgment. For the reasons set forth below, the Court finds that the Defendants Adams, Maxson, and Anthony are entitled to qualified immunity and should therefore be granted summary judgment, but that the Defendant Bryant, in his official capacity as representative of the County, is not entitled to summary judgment.

### A. Individual Liability Claims.

The Court first turns to the claims asserted by the Plaintiff against the Defendants Adams, Maxson and Anthony in their individual capacities. Such claims are subject to the defense of qualified immunity. *See, e. g., Clark v. Wilson*, 625 F.3d 686, 690 (10th Cir. 2010) ("The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."), *quoting Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

"When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right *and* (2) the constitutional right was clearly established. The court may consider either of these prongs before the other 'in light of the circumstances in the particular case at hand.'" *Cunningham v. New Mexico*, 2014 WL 12791236, at *4 (D. N.M. May 2, 2014), *quoting Pearson*, 555 U.S. at 236 (emphasis added). "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan*, 511 U.S. 825, 844 (1994). "In other words, immunity protects 'all but the plainly

incompetent or those who knowingly violate the law.'" *White v. Pauly*, _ U.S. _, 137 S. Ct. 548, 551 (2017), *quoting Mullenix v. Luna*, _ U.S. _, 136 S. Ct. 305, 308 (2015). "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Rojas v. Anderson*, 727 F.3d 1000, 1003 (10th Cir. 2013) (internal quotation marks omitted).

**1. The Claim for Failure to Provide Medical Care.**

The Plaintiff's first claim is for failure to provide medical care. It is asserted against Adams and Maxson, who were jailers on duty at various times during his confinement, and against Anthony, who as the sheriff at the time was charge with their supervision and training. Allegations of failure to provide medical care "must be judged against the 'deliberate indifference to serious medical needs' test of *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)." *Frohmader v. Wayne*, 958 F.2d 1024, 1028 (10th Cir. 1992), *quoting Martin v. Board of County Commissioners of County of Pueblo*, 909 F.2d 402, 406 (10th Cir. 1990). Under the Eighth Amendment, "prison officials must ensure that inmates receive adequate food, clothing, shelter, and **medical care**, and must 'take reasonable measures to guaranty the safety of the inmates.'" *Farmer*, 511 U.S. at 832 (emphasis added), *quoting Hudson v. Palmer*, 468 U.S. 517, 526-527 (1984). "Failure to provide adequate medical care is a violation of the Eighth Amendment if it is a result of deliberate indifference to a prisoner's serious medical needs." *Garcia v. Salt Lake County*, 768 F.2d 303, 307 (10th Cir. 1985), *citing Estelle*, 429 U.S. 97.

> Deliberate indifference involves both an objective and a subjective component. The former is met if the deprivation is sufficiently serious – that is, if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. The latter is satisfied if an officer knows of and disregards an excessive risk to a detainee's health or safety. Essentially, the officer must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002) (internal citations and quotations omitted). *See also Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) ("The test for deliberate indifference is both objective and subjective."), *citing Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006). "Our cases recognize two types of conduct constituting deliberate indifference. First, a medical professional may fail to treat a serious medical condition properly. . . . The second type of deliberate indifference occurs when prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment." *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000). Here, the latter type of deliberate indifference is at issue with regard to Defendants Adams and Maxson.

The Tenth Circuit has explained that the objective component is based on the harm claimed by the plaintiff, and "whether the harm suffered rises to a level 'sufficiently serious' to be cognizable under the Cruel and Unusual Punishment Clause.'" *Mata v. Saiz*, 427 F.3d 745, 753 (10th Cir. 2005), *quoting Farmer*, 511 U.S. at 834. "Once the prisoner selects the harm, however, the focus of the objective prong should be solely on whether that harm is sufficiently serious." *Mata*, 427 F.3d at 753. In this case, the Plaintiffs claim the harm is death by pulmonary embolism, which the Court finds is of sufficient

seriousness to satisfy this objective component. *See, e. g.*, *Martinez*, 563 F.3d at 1088-1089 ("We agree with Martinez and the district court that 'the ultimate harm to Mr. Ginn, that is, his heart attack and death, was, without doubt, sufficiently serious to meet the objective component' necessary to implicate the Fourteenth Amendment.").

"The subjective component is akin to 'recklessness in the criminal law,' where, to act recklessly, a 'person must 'consciously disregard' a substantial risk of serious harm.' And '[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence.' The fact that a serious medical need was 'obvious' could be evidence of deliberate indifference, although a 'prison official may show that the obvious escaped him' and avoid liability." *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006), *quoting Farmer*, 511 U.S. at 837, 839, 842-843 & n. 8. As such, "the Tenth Circuit has recognized that conduct constituting deliberate indifference may arise in the form of 'a prison official preventing an inmate from receiving medical treatment or denying access to medical personnel capable of evaluating the inmate's condition.'" *Welsh v. Bishop*, 2015 WL 1064155, at *4 (D. Colo. March 9, 2015), *quoting Self*, 439 F.3d at 1232 ("A claim is therefore actionable only in cases where the need for additional treatment or referral to a medical specialist is obvious.").

Put another way, "the prisoner must show that the defendants knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Martinez*, 563 F.3d at 1089, *quoting Callahan*, 471 F.3d at 1159. "Defendants will not be entitled to qualified immunity if the symptoms displayed by Plaintiff were

obvious enough to warrant a finding that Defendants knew of the risk of a serious medical condition but disregarded that risk." *Marquez v. Board of County Commissioners Eddy County*, 2012 WL 12895017, at *5 (D. N.M. Dec. 3, 2012). Accordingly, "[a] prisoner may satisfy the subjective component by showing that defendants' delay in providing medical treatment caused either unnecessary pain or a worsening of his condition. Even a brief delay may be unconstitutional." *Mata*, 427 F.3d at 755 (collecting cases); *Winrow v. Stell*, 2015 WL 3645702, at *7 (W.D. Okla. March 5, 2015) ("Denying or delaying a prisoner's access to medical professionals capable of assessing or treating the prisoner's condition can establish the subjective component, particularly when unnecessary pain or a worsened condition results."). However, "[m]ere negligence by prison officials or medical staff will not suffice to meet the subjective prong of deliberate indifference." *Casanova v. Ulibarri*, 2011 WL 13157058, at *6 (D.N.M. Sept. 1, 2011) (internal citations omitted). As such, "[t]he question is: 'were the symptoms such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?'" *Martinez*, 563 F.3d at 1089, *quoting Mata*, 427 F.3d at 753. *See also Whiteman v. El Paso Criminal Justice Ctr.*, 2011 WL 2610202, at *4 (D. Colo. July 1, 2011) ("[A] general awareness of the potential for harm is not enough; there must be a connection between the subjective disregard of a risk of serious harm and the objective harm actually claimed."), *citing Martinez*, 563 F.3d at 1089 n.8.

**Adams and Maxon.** The Court notes initially Manos was not provided a medical screening upon intake, and there is evidence he was not monitored every half hour, both of which would violate written jail policy. But there is no allegation that Adams or Maxson

had anything to do with the failure to screen Manos upon his arrival, and in any event violation of jail policy (even if such policy is required by state law) would not *ipso facto* establish a constitutional violation under Section 1983. *Rector v. City and County of Denver*, 348 F.3d 935, 947 (10th Cir. 2003) ("It is well established, however, that a state's violation of its own laws does not create a claim under § 1983."). Here, the primary dispute between the parties is whether Adams or Maxson knew Manos needed medical care prior to the time an ambulance was called on November 7, 2015. *See Farmer*, 511 U.S. at 842-844 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. . . .[I]t remains open to the officials to prove that they were unaware even of an obvious risk to inmate health or safety. That a trier of fact may infer knowledge from the obvious, in other words, does not mean that it must do so.").

Adams testified that initially he thought Manos was faking his symptoms in order to get out of the jail, and said that he had informed Jail Administrator Armstrong and Nurse Miller of his condition and that he had informed them in person, and that both Armstrong and Miller informed him they were working on it. Docket No. 195, Ex. 5, pp. 2-6. Part of the impetus for reporting Manos's behavior was that he believed no sane person would eat or drink their own feces or urine. Docket No. 206, Ex. 5, p. 16. He testified that prior to November 7, he had seen Manos lying in his own feces a week or week and a half prior. Docket No. 206, Ex. 5, p. 9. He also testified he observed Manos get up and walk around, beating the walls and yelling. *Id.* He testified that, when he was on shift, he continued to serve Manos his meals, but did not stand and watch to see whether he ate the meals. *Id.* at p. 12.

Adams contends that there is no evidence in the record that he knew that Manos was facing any sort of medical issue, nor was he aware that Manos was experiencing symptoms of a pulmonary embolus or dehydration. Adams further notes that the Plaintiff's expert agreed that diagnosing such conditions was beyond the scope of a jailer, and there is no evidence that Adams refused meals or medications to Manos.

The Plaintiff nevertheless contends that, although Adams was not required to diagnose catatonia, pulmonary embolus, or dehydration, even a lay person would identify the signs of acute psychosis that Manos exhibited, and that it was obvious that he needed an evaluation from a qualified mental health and/or medical professional. The Plaintiff points to the record indicating that Adams had seen Manos laying on the floor, growling and mumbling, as well as seen him lying naked in his own feces, and that Adams saw him rapidly decline and was aware Manos had been eating his own feces. Additionally, Adams knew that Manos had refused his medications, and had access to the medication logs. But the Plaintiff only cites to cases at the dismissal stage in support of her arguments that Adams knew of an excessive risk to Manos' health and safety, which contain an entirely different standard for analysis. *See, e. g.*, *Gray v. Geo Group, Inc.*, 727 Fed. Appx. 940, 945 (10th Cir. 2018) (allegation that "he notified the named defendants of the persistent medication errors and their potential consequences and of his deteriorating mental health" as well as defendants' failure to take action, were sufficient to survive *dismissal*). She further asserts that Adams failed to provide Manos with access to medical personnel, but the uncontradicted evidence is that he believed Jail Administrator Armstrong and Nurse Miller were both aware of Manos and his condition.

Maxson, on the other hand, had worked at the jail approximately a month and a half prior to Manos' death. Docket No. 209, Ex. 14, p. 7. He testified that he saw Manos sitting on his bed in his cell three to four days prior to his death, Docket No. 172, Ex. 7, p. 8, and that Manos usually "grunted or responded in some form, shape, or fashion," when spoken to by the jailers. Docket No. 209, Ex. 14, at p. 7. Maxson further testified that on the night of November 7, he saw Manos lying on his back when the cell opened, and he smelled feces but never saw it. Docket No. 172, Ex. 7, at p. 3. After his last pass by Manos' cell, Maxson testified that he "didn't imagine that there was any medical need," but that "something just seemed different," so he went to get Adams for a second opinion. *Id.* at p. 5-6. Maxson further testified that no one gave him Manos's medical history, that they were checking Manos every hour, and that he never saw Manos eating his own feces, or drinking his urine. *Id.* at 10, 12; Docket No. 209, Ex. 14, p. 12.

Maxson thus asserts that although it might constitute negligence that he failed to do anything after noticing the smell of feces, Manos's slow movements, and his minimal verbal responses, this did not rise to the level of deliberate indifference. He also notes that the administrator and nurse had access to the medication logs and were generally aware of Manos's condition. Finally, he contends that his actions on the night Manos died likewise do not rise to the level of deliberate indifference because he believed Manos was breathing, it was not unusual for inmates to be asleep at that time or for Manos to fail to respond verbally, and he ultimately decided to get a second opinion within five minutes of that encounter. Maxson thus asserts that he did his best in light of limited experience and lack of medical training. The Plaintiff disagrees, arguing that Manos's symptoms of psychosis

-16-

were blatant, and that even a lay person would have identified his need for evaluation from a medical professional. Plaintiff cites a number of evidentiary "facts" in support of this, but only a few of these relate to Maxson:  that Maxson knew Manos had been eating his feces, that Maxson was aware Manos had been refusing his medications, and that Maxson had access to the medication logs.  Further, the Plaintiff asserts that it was obvious for days that something was very wrong with Manos, and she contends Maxson watched Manos "slip further and further into madness" while doing nothing.

The Court notes that the risk claimed by the Plaintiff (here, death by pulmonary embolism) must be the same risk ignored by the Defendants.  *See Bruner-McMahon v. Jameson*, 566 Fed. Appx. 628 (10th Cir. 2014) ("The risk prison officials ignored must be the risk appellants claimed."), *citing Martinez*, 563 F.3d at 1089 ("Finally, the subjective component requires the prison official to disregard the risk of harm claimed by the prisoner.").  Although the need for a mental health evaluation may have been obvious, the Plaintiff has pointed to no evidence that either Adams or Maxson was aware of the risk of death by pulmonary embolism.  *Estate of Moffitt by and through Kramer v. Minor*, 2017 WL 6349706, at *14 (D. Colo. Sept. 28, 2017) ("Although Hosier may have ultimately been wrong in his assessment that Moffitt needed mental health treatment as compared to treatment for his alcohol related symptoms, a mistake or even negligent failure to provide adequate medical care does not rise to the level of a constitutional violation.").  *See also Bruner-McMahon*, 566 Fed. Appx. at 634 (noting that "appellants were required to produce evidence showing that defendants appreciated that [the inmate] 'had a risk of a fatal medical condition and chose to disregard' *that* risk.")  (emphasis in original) (quoting lower

-17-

court record).

As the foregoing discussion demonstrates, the Plaintiff has not shown any evidence that either Adams or Maxson was deliberately indifferent to his need for medical treatment. But even if the Plaintiff had made such a showing, in order to avoid the asserted defense of qualified immunity, the Plaintiff would further have to show that the Defendants' actions violated a clearly established constitutional right. "Ordinarily, a plaintiff may show that a particular right was clearly established at the time of the challenged conduct 'by identifying an on-point Supreme Court or published Tenth Circuit decision; alternatively, 'the clearly established weight of authority from other courts must have found the law to be as he maintains.'" *A.M. v. Holmes*, 830 F.3d 1123, 1135 (10th Cir. 2016), *quoting Quinn v. Young*, 780 F.3d 998, 1005 (10th Cir. 2015). However, "'clearly established law' should not be defined 'at a high level of generality.'" *White*, 137 S. Ct. at 552, *quoting Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). Instead, it "must be 'particularized' to the facts of the case. Otherwise, plaintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.*, 137 S. Ct. at 552, *quoting Anderson v. Creighton*, 483 U.S. 635, 639-640 (1987).

In this Circuit, "[t]he right to custodial medical care is clearly established." *Olsen*, 312 F.3d at 1315, *citing Estelle*, 429 U.S. at 104. Moreover, "[i]t is the medical need, not the offense charged, that triggers a person's right to medical attention upon custodial arrest." *Rife v. Oklahoma Dept. of Public Safety*, 2017 WL 2623868, at *3 (E.D. Okla. June 16, 2017) (slip op.) ("So, whether Mr. Rife was injured by the motorcycle accident –

as defendant Jefferson should have known – or impaired from intoxication – as defendants Wallis and Dale believed – his symptoms clearly established a right to medical attention during his transport to and detention at the McCurtain County Jail."), *reversed on other grounds in Rife v. Jefferson*, 2018 WL 3660248 (10th Cir. Aug. 2, 2018), *citing*, *Garcia*, 768 F.2d at 307-308; *Barton v. Tabor*, 820 F.3d 958, 965-967 (10th Cir. 2016); and *Marquez*, 2012 WL 12895017, at \*7-8.  Here, it is the issue of medical care while he was at the Jail.

The Plaintiff relies on *Olsen* to support her argument that the law was clearly established regarding the prohibition on deliberate indifference to an inmate's serious mental health needs.  But in *Olsen*, the Tenth Circuit found that there was a jury question as to whether an officer disregarded an excessive risk to an arrestee's health where the arrestee told the officer he was having a panic attack and admitted prior health problems, and the arrestee was denied his medications.  *Olsen*, 312 F.3d at 1317.  Here, Manos was repeatedly offered his medications and food trays, and the Plaintiff has pointed to no other Supreme Court or Tenth Circuit law.  The Court therefore finds there is no clearly established law that there is a constitutional requirement of consulting a medical or mental health professional where an inmate had twice previously been cleaned up after rolling around in feces and also refused medications and some (but not all) meals.  *See Perry v. Durborow*, 892 F.3d 1116, 1123 (10th Cir. 2018) ("Perry must identify a case where an official acting under similar circumstances as [Defendant] was held to have violated the Constitution.") (internal quotations omitted), *citing White v. Pauly*, 137 S. Ct. at 552.

In summary, because the Plaintiff has not shown that the Defendants Adams and

Maxson were deliberately indifferent to Manos' medical needs, or that the law was clearly established as to those Defendants' actions, the Court finds that the Defendants Adams and Maxson are entitled to qualified immunity on the Plaintiff's first claim for relief, *i. e.*, the alleged failure to provide medical care.

**Former Sheriff Anthony.** The Defendant Anthony was the sheriff of Carter County at the time Manos was an inmate at the Carter County Jail, and Plaintiff alleges supervisory liability claims, as well as failure to train and failure to supervise claims, against him. "Section 1983 does not authorize liability under a theory of respondeat superior." *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011), *citing Monell v. Dep't of Social Services*, 436 U.S. 658, 691 (1978). "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. The Tenth Circuit has interpreted this to mean that "§ 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy" causing the constitutional harm. *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010). This takes the form of either personal liability through personal involvement, *or* supervisory liability based on a violation of a policy. *Brown*, 662 F.3d at 1164-1165 ("Personal liability under § 1983 must be based on . . . personal involvement, and supervisory liability must be based on his Policy."). It thus becomes the Plaintiff's burden to demonstrate for purposes of supervisory liability that "(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the

complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Dodds*, 614 F.3d at 1199-1200 ("Denying qualified immunity on the basis of such a showing complies with *Iqbal*'s requirement that § 1983 liability only be imposed upon those defendants whose own individual actions cause a constitutional deprivation because it requires plaintiffs prove each defendant took some act with the constitutionally applicable state of mind that caused the alleged constitutional violation.") (citation omitted). "Therefore it is particularly important in such circumstances that the complaint make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state." *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008) (emphasis in original). As such, the task remaining before the Court is therefore whether Former Sheriff Anthony has violated the Plaintiff's constitutional or statutory rights.

To establish personal involvement for supervisory liability, it is insufficient "merely to show [that the supervisor] was in charge of other state actors who actually committed the violation." *Dodds*, 614 F.3d at 1195, (quotation omitted). What *is* required is that the "plaintiff must plead that *each* Government-official defendant, through the official's own individual actions, has violated the Constitution." *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 768 (10th Cir. 2013) (emphasis added), *quoting Iqbal*, 556 U.S. at 676. As to causation, the Plaintiff is required "to show that the defendant's alleged action(s) caused the constitutional violation" by "set[ting] in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the

plaintiff of her constitutional rights." *Schneider*, 717 F.3d at 768 (alteration in original) (*quoting Dodds*, 614 F.3d at 1185, 1200). As to the third element, "[p]recisely what state of mind is required for individual liability depends on the type of claim a plaintiff brings," *Schneider*, 717 F.3d at 769, but "'can be no less than the *mens rea* required' of the subordinates to commit the underlying constitutional violation." *Estate of Booker v. Gomez*, 745 F.3d 405, 435 (10th Cir. 2014), *quoting Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010). "In sum . . . plaintiffs here must establish that each defendant – whether by direct participation or by virtue of a policy of which he possesses supervisory responsibility – caused a violation of plaintiffs' clearly established constitutional rights, and that each defendant acted with the constitutionally requisite state of mind." *Pahls v. Thomas*, 718 F.3d 1210, 1228 (10th Cir. 2013) (emphasis added). *See also Brown*, 662 F.3d at 1164-1165 ("Personal liability under § 1983 must be based on Secretary Williams's personal involvement, and supervisory liability must be based on his Policy.").

Anthony asserts that there was no underlying constitutional violation and that he did not personally participate in any denial of medical care for Manos because he was not aware of Manos' refusal of his medications, his medical condition, his conduct regarding feces, or any other information regarding him. He further asserts that arguments he "should have been aware" are insufficient to establish liability. Furthermore, Anthony asserts that he was not responsible for a policy that caused the alleged deprivation of harm to Manos. He asserts he had appropriate policies in place, and that he relied on Jail Administrator Armstrong and Nurse Miller to enforce them, and that he is not responsible for deviations from these policies. Furthermore, he argues the claims for failure to train and supervise

must likewise fail because he had no expectation or knowledge that jail staff were ignoring or neglecting duties under the policies.

The Plaintiff contends that there is ample evidence of an underlying constitutional violation, which is part of the analysis for personal liability through personal involvement. *See Schneider*, 717 F.3d at 767 ("This notion is embodied in the three elements required to establish a successful § 1983 claim against a defendant based on his or her supervisory responsibilities: (1) personal involvement; (2) causation, and (2) state of mind."). However, there is no evidence of direct participation by Anthony as to Manos or his care at the jail. In fact, it is clear that Anthony was not aware of Manos until after he died. As such, the Court turns to whether, by virtue of a policy of which Anthony possessed supervisory responsibility, he caused a violation of Manos' clearly established constitutional rights, and that he acted with the constitutionally requisite state of mind. *See Pahls*, 718 F.3d at 1228.

Under *Dodds*, the question then becomes whether Anthony "[1] promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." 614 F.3d at 1199-2000. As sheriff at the time, Anthony certainly possessed responsibility for the continued operation of the jail policies. This case, then, turns on the last two factors, *i. e.*, whether he caused the complained-of constitutional harm and did so with the requisite state of mind. *See Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008) ("The official's knowledge of the risk need not be knowledge of a substantial risk to a *particular* inmate, or knowledge of

the particular manner in which injury might occur.") (emphasis in original). *See also Layton v. Bd. of Cty. Comm'rs of Oklahoma Cty.,* 512 Fed. Appx. 861, 870 (10th Cir. 2013) ("Appellants merely needed to present evidence that Mr. Holdstock faced a substantial risk of serious harm of which the prison officials were, or should have been, aware."), *citing Gonzales v. Martinez,* 403 F.3d 1179, 1183 (10th Cir.2005) ("[A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm *actually* would befall an inmate; it is enough that the official acted or failed to act *despite his knowledge* of a substantial risk of harm.") (emphasis in original), *quotin*g *Farmer,* 511 U.S. at 842, (1970) (internal quotation marks omitted).

The Plaintiff points to *Burke v. Glanz*, 2016 WL 3951364, at *23 (N.D. Okla. July 20, 2016), which found Stanley Glanz "responsible for knowingly continuing the operation of a policy or established practice of providing constitutionally deficient medical care in deliberate indifference to the serious medical needs of Jail inmates like Mr. Williams." But there, then-Sheriff Glanz had been "notified, repeatedly, that the Jail's medical care system was dangerously deficient, placing inmates like Mr. Williams at substantial risk of serious harm, but that Glanz continued the operation of a policy providing that dangerously deficient care." *Id.* In fact, then-Sheriff Glanz had been notified of risks to inmates in audits in 2007 and 2010, and was also notified in months prior to the 2011 incident in that case of serious problems; he was therefore was well aware of the risk of serious harm to inmates due to deficiencies, even to the point of instructing that medical records be hidden. *See also Tafoya*, 516 F.3d at 921 ("Unlike the absence of any such evidence in *Hovater* and *Pulsipher,* Ms. Tafoya provided testimony that would allow a reasonable jury to infer

that Sheriff Salazar knew of the dangerous conditions at the jail and deliberately elected not to remedy them."). The Court agrees that there very well may have been some negligence involved in the administration of the policy surrounding medical treatment of inmates at the Carter County Jail. However, the Court cannot find evidence of awareness of the risk of harm rising to the level of deliberate indifference. *See Gonzales v. Martinez*, 403 F.3d 1179, 1183 (10th Cir. 2005) ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including *inference* from circumstantial evidence."), *quoting Farmer*, 511 U.S. at 842.

As to the Plaintiff's claims that Anthony failed to train and supervise, the Court finds these claims likewise fail. The Court agrees that there is evidence in the record that some, if not all of the jail employees, were poorly trained if at all. "It is not enough, however, for appellant to show that there were general deficiencies in the county's training program for jailers. Rather, he must identify a specific deficiency in the county's training program closely related to his ultimate injury, and must prove that the deficiency in training actually caused his jailer to act with deliberate indifference to his safety." *Lopez v. LeMaster*, 172 F.3d 756, 760 (10th Cir. 1999), *citing City of Canton v. Harris*, 489 U.S. 378, 391 (1989). But here, the Court cannot say that Anthony was aware of the risk of harm arising out of this failure. *See, e. g.*, *Dubois v. Bd. of Cty. Commissioners of Mayes Cty.*, *Oklahoma*, 2016 WL 1091099, at *9 (N.D. Okla. Mar. 21, 2016) ("Plaintiff has not provided any evidence that the former Sheriff, Frank Cantey, had any knowledge of plaintiff's serious medical needs or deliberately disregarded them, or that Cantey was

aware that inmates like plaintiff were at substantial risk of harm because of a constitutionally infirm condition that was obvious. While there were certain obvious training deficiencies regarding the provision of medical care to inmates, that evidence does not support a claim against Mr. Cantey in his individual capacity. In short, plaintiff has not presented evidence from which a jury could infer that Cantey had the requisite state of mind, was in any way personally involved in denying or delaying medical care to Dubois, or that he knew of and disregarded an excessive risk to Dubois' health or safety."), *aff'd in part, rev'd in part, dismissed in part sub nom. DuBois v. Brown*, 666 F. App'x 721 (10th Cir. 2016). Plaintiff contends that Anthony *was* aware of deficiencies because of two previous reported instances of inmates not receiving medications in 2013, and alleges that Manos likewise did not receive his medication. However, even if that was a deficiency for which Anthony had been made aware, the evidence reflects that Manos *was* offered his medications but refused them. Accordingly, Anthony is entitled to qualified immunity under these circumstances.

### 2. The Failure to Provide Humane Treatment.

The Plaintiff's second claim for relief is that the Defendants Adams and Maxson failed to provide him with humane conditions of confinement. "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer*, 511 U.S. at 832 (internal quotations and citations omitted). Under the Eighth Amendment, "prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and

must 'take reasonable measures to guaranty the safety of the inmates.'" *Farmer*, 511 U.S.

at 832, *quoting Hudson v. Palmer*, 468 U.S. 517, 526-527 (1984). "In order for a condition

of confinement to be considered cruel and unusual it must be eithers: (a) 'grossly

disproportionate to the severity of the crime' warranting punishment, (b) involve the

'wanton and unnecessary infliction of pain' or (c) deprive 'inmates of the minimal civilized

measure of life's necessities.'" *Mitchell v. Maynard*, 80 F.3d 1433, 1441-1442 (10th Cir.

1996), *quoting Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

> "We apply a two-part test in evaluating conditions of confinement claims. To hold a jailer personally liable for violating an inmate's right to humane conditions of confinement, a plaintiff must satisfy two requirements, consisting of an objective and subjective component. The objective component requires that the alleged deprivation be sufficiently serious, and the subjective component requires the jail official to have a sufficiently culpable state of mind.

*Allen v. Avance*, 491 Fed. Appx. 1, 3 (10th Cir. 2012), *citing Craig v. Eberly*, 164 F.3d

490, 495 (10th Cir. 1998). *See also Martinez*, 563 F.3d at 1088 ("The test for deliberate

indifference is both objective and subjective."), *citing Callahan*, 471 F.3d at 1159. "It is

important to consider the conditions of confinement as a whole because several

deprivations 'in combination' may constitute a constitutional violation 'when they have a

mutually enforcing effect that produces the deprivation of a single, identifiable human

need, such as food, warmth, or exercise – for example a low cell temperature at night

combined with a failure to issue blankets.'" *Mitchell*, 80 F.3d at 1442, *quoting Wilson v.

Seiter*, 501 U.S. 294, 304 (1991).

> Deliberate indifference involves both an objective and a subjective component. The former is met if the deprivation is sufficiently serious – that is, if it is one that has been diagnosed by a physician as mandating treatment

or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. The latter is satisfied if an officer knows of and disregards an excessive risk to a detainee's health or safety. Essentially, the officer must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Olsen*, 312 F.3d at 1315 (internal citations and quotations omitted).

"The failure to provide basic necessities, if sufficiently prolonged and severe, can satisfy the objective prong of this test." *Allen*, 491 Fed. Appx. at 3, *citing Mitchell*, 80 F.3d at 1433. "In cases challenging the conditions of a prisoner's confinement, the subjective standard is one of deliberate indifference to inmate health or safety." *Perkins v. Kansas Dept. of Corr.*, 165 F.3d 803, 809 (10th Cir. 1999), *citing Farmer*, 511 U.S. at 834.

The Plaintiff contends that Manos was naked, alone, lying on the cell floor in his own feces, and that he did not have access to drinking water. She points to photos of the jail cell that appear to show a faucet pulled out from the wall, *see* Docket No. 206, Ex. 29, as well as an OCME Supplemental Report which included a summary of a report from Justin Brown of Oklahoma State Bureau of Investigation ("OSBI") dated November 17, 2015 (ten days after Manos's death) which indicated that Manos "had flooded jail cell by stopping up toilet with items from inside the jail cell, then flushed the toilet over and over, causing it to spill over the top – jail may have turned water off to prevent flooding. Inmates have access to drinking water from the sink faucet inside jail cell." Docket No. 206, Ex. 18. She further contends that Maxson and Adams ignored Manos's condition for days, and neither ensured he was adequately hydrated.

Adams asserts that he did not act with deliberate indifference in this case because he never refused food to Manos. He testified that he continued to provide meals and medication for Manos, and that he never personally cleaned Manos' cell but that the night shift was responsible for keeping it clean. He noted that it was difficult to keep clean, and that it smelled terrible even after being bleached and cleaned, but it would not always be as bad. Docket No. 206, Ex. 5, at pp. 14-15. Furthermore, Adams asserts that Manos had the opportunity to shower every day, and was in fact showered by jailers on two occasions, and that even if the conditions were somehow intolerable, he did not contribute to those conditions. Maxson likewise contends that he did not act with deliberate indifference; he testified that Manos's cell smelled at times, but that he never observed feces in the cell, and feces are only documented on November 3 and November 7; that the cell was cleaned on a regular basis and cleaning supplies were available to the inmates, although the smell was hard to remove; and that inmates' clothing was laundered weekly and showers were allowed daily. Maxson also notes that deputies helped shower Manos on at least two occasions, and that the feces smeared in the cell was the result of Manos' actions, while the jailers made efforts to remove the feces.

The Plaintiff also contends that Adams and Maxson failed to ensure Manos was adequately hydrated. While it is disputed whether those defendants knew about the water being turned off, there is nothing in the record to indicate when the water may have been turned off or for how long. Nor is there any evidence that either Maxson or Adams was aware that Manos did not have access to water. *See Farmer*, 511 U.S. at 842-844 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact

that the risk was obvious. . . .[I]t remains open to the officials to prove that they were unaware even of an obvious risk to inmate health or safety. That a trier of fact may infer knowledge from the obvious, in other words, does not mean that it must do so."). It is thus impossible to find that Adams and Maxson were deliberately indifferent to any need by Manos for hydration.

"An important factor in determining whether conditions of confinement meet constitutional standards is the length of the incarceration." *Barney v. Pulsipher*, 143 F.3d 1299, 1311 (10th Cir. 1998), *citing, inter alia*, *White v. Nix*, 7 F.3d 120, 121 (8th Cir. 1993) (eleven day stay in unsanitary cell not unconstitutional because of relative brevity of stay and availability of cleaning supplies). Based on the precedent evidence and relevant case law, the Court finds that, seen in the light most favorable to the Plaintiff, the evidence would not support an inference of deliberate indifference on behalf of Defendants Adams or Maxson where, as here, there is no evidence that either Maxson or Adams refused Manos food, water, medications, cleaning supplies, or a shower, and even if Manos did have a filthy cell on several occasions, and did not have access to water at some point, there is no evidence that such conditions lasted more than a day. Moreover, there *is* evidence that cleaning supplies were made available to inmates nightly, that Manos's cell was cleaned by trustees on November 3 when he was covered in feces, that showers were offered daily, and that Manos had access to water in his cell through the faucet most, if not all, of the time. *See, e. g.*, *Whitnack v. Douglas County*, 16 F.3d 954, 958 (8th Cir. 1994) (deplorably filthy and patently offensive cell with excrement and vomit not unconstitutional because conditions lasted only for 24 hours), *cited with favor in Barney*, 143 F.3d at 1312.

As the foregoing demonstrates, the Plaintiff has failed to show that either Adams or Maxson was deliberately indifferent to the conditions of Manos' confinement. But even if the Plaintiff had made such a showing, she would further be required to show that the defendants' actions violated a clearly established constitutional right in order to avoid their defense of qualified immunity. "Ordinarily, a plaintiff may show that a particular right was clearly established at the time of the challenged conduct 'by identifying an on-point Supreme Court or published Tenth Circuit decision; alternatively, 'the clearly established weight of authority from other courts must have found the law to be as [she] maintains.'" *A.M. v. Holmes*, 830 F.3d at 1135, *quoting Quinn v. Young*, 780 F.3d at 1005. However, "'clearly established law' should not be defined 'at a high level of generality.'" *White*, 137 S. Ct. at 552, *quoting al-Kidd*, 563 U.S. 731, 742 (2011). Instead, it "must be 'particularized' to the facts of the case. Otherwise, plaintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *White*, 137 S. Ct. at 552, *quoting Anderson v. Creighton*, 483 U.S. 635, 639-640 (1987).

The Plaintiff has not pointed to any clearly established law as to her claim regarding the conditions of Manos' confinement. *See Guffey v. Wyatt*, 18 F.3d 869, 871 (10th Cir. 1994) ("As our jurisprudence makes clear, when a defendant raises qualified immunity, the burden shifts to the plaintiff to establish the defendant violated clearly establish constitutional rights."). The Court notes that the Tenth Circuit has previously held that a person stated a claim for relief under the Eighth Amendment where he alleged he had been restrained with a stun belt, belly chains, handcuffs, and a box covering the handcuffs, which

prevented access to food and water for more than 24 hours. *Gee v. Pacheco*, 627 F.3d 1178, 1189 (10th Cir. 2010). The Court finds this case distinguishable, however, in numerous ways, including that the plaintiff in that case was completely bound for over 24 hours. Furthermore, "[i]n general, the severity and duration of deprivations are inversely proportional, so that minor deprivations suffered for short periods would not rise to an Eighth Amendment violation, while substantial deprivations of shelter, food, drinking water, and sanitation may meet the standard despite a shorter duration." *Despain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001). *See also Broadus v. DeCesaro*, 2016 WL 11384330, at *9, 11 (D. Colo. Jan. 21, 2016) (where Plaintiff alleged a substantial deprivation of drinking water for five months, the "Court finds that the law was clearly established prior to August-January of 2013-2014 that depriving an inmate of adequate drinking water for a substantial period is unconstitutional[,]" but no violation of clearly established law where two jailers deprived plaintiff of water, but the deprivations lasted no more than twenty-four hours). The Court thus cannot find that Adams or Maxson violated clearly established law under the facts of this case. Consequently, the Court finds that Adams and Maxson are entitled to qualified immunity on the Plaintiff's second claim for relief regarding the conditions of Manos' confinement.

## B. The Official Capacity Claim.

The Court now turns to the summary judgment motion by the Defendant Bryant in his official capacity as the Carter County Sheriff. Such a claim is "another way of pleading an action against the county or municipality they represent." *Porro*, 624 F.3d at 1328. *See also Cox v. Glanz*, 800 F.3d 1231, 1254 (10th Cir. 2015) ("Under *Monell* [*v. Dept. of Social*

*Servs. of City of New York*, 436 U.S. 658 (1978)], a local governmental unit such as a municipality or a county, like Tulsa County, 'is a 'person' subject to § 1983 liability,' and a 'suit against Sheriff [Glanz] in his official capacity as sheriff is the equivalent of a suit against [Tulsa] County.'"), *quoting McDonald v. Wise*, 769 F.3d 1202, 1215 (10th Cir. 2014) and *Lopez*, 172 F.3d at 762.   Moreover, "a finding of qualified immunity does not shelter a municipality from liability." *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993) ("When a finding of qualified immunity is predicated on the basis that the law is not clearly established, it is indeed correct that 'there is nothing anomalous about allowing 'a suit against a municipality] to proceed when immunity shields the individual defendants[, for] [t]he availability of qualified immunity does not depend on whether a constitutional violation has occurred.'"), *quoting Watson v. City of Kansas City, Kan.*, 857 F.2d 690, 697 (10th Cir. 1988).

This type of claim further "requires the plaintiff [to] prove (1) the entity executed a policy or custom (2) that caused the plaintiff to suffer deprivation of constitutional or other federal rights." *Cox*, 800 F.3d at 1255 (internal quotations omitted).   "Thus, a municipal entity may be held liable only for an act it officially sanctioned or for the actions of an official with policymaking authority.   An official policy can be shown through an official decision or statement or through 'the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law.'"   *Goss v. Board of County Commissioners of Creek County*, 645 Fed. Appx. 785, 789 (10th Cir. 2016), *quoting City of St. Louis v. Praprotnik*, 485 U.S. 112, 122-123, 127 (1988).  *See also Yarbrough v. City*

*of Kingfisher*, 153 F.3d 730, 1998 WL 427122, at *3 (10th Cir. July 14, 1988) (unpublished Table Opinion) ("[A] plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."), *quoting Board of County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).

Bryant asserts that, contrary to Plaintiff's allegations, the sheriff had implemented policies and practices to prevent the denial or delay of medical care to inmates, and although they could not find a physician to work for the jail, they hired a full-time nurse who was also on-call when she was not at the Jail. The nurse had access to the medication logs and the jail entry log, and former sheriff Anthony relied on her to handle the medical needs of the inmates at the Jail. The policy required, *inter alia*:  (i) hourly checks for all inmates, and checks every half hour for mentally or emotionally disturbed inmates; (ii) that inmate medications be distributed according to physician's orders, and continue to offer any refused medications according to the scheduled times; (iii) that inmates be provided with three meals a day and that meals were not to be withheld, except that desserts and snacks were allowed to be punitively withheld, but only when unnecessary to meet nutritive needs; (iv) that inmates could accept or decline any food offered, and refusals were to be logged; and (v) that the policy had a procedure for encountering medical emergencies, including notifying supervisors and the jail nurse and/or calling for an ambulance. He asserts that, in accordance with this very policy, an ambulance was called on November 3 for Manos. Bryant further contends that there is no evidence of any persistent or widespread pattern of denial of medical care to inmates at the jail.

The Plaintiff responds that jail staff prevented Manos from receiving treatment and being taken to the hospital on November 3. Moreover, she contends that Nurse Miller and Jail Administrator Armstrong were deliberately indifferent to Manos's serious medical needs because Nurse Miller failed to do anything with regard to Manos' treatment or care, including never reviewing the medication logs or assessing Manos, and that Armstrong likewise did nothing despite observing jailers dragging Manos into the shower on November 3. The Plaintiff further alleges widespread policies of failing to distribute medications to inmates, refusing to transport inmates to the ER, and failing to notify Nurse Miller when and why inmates were transferred to the medical block (where Manos was being held when he died). Moreover, she asserts that the jailers were not provided with the jail's policy manual, or trained on policy requirements.

Regarding any official capacity claim against Bryant as the sheriff of Carter County, the Plaintiff was required to "show a genuine issue as to whether the employees who violated [Mr. Manos'] rights were acting pursuant to an official municipal policy." *Anaya v. Crossroads Managed Care Systems, Inc.*, 195 F.3d 584, 592 (10th Cir. 1999). The Court finds that the Plaintiff has not provided evidence raising a genuine issue as to deprivation of medications for inmates or notification of the status of inmates to Nurse Miller. Though perhaps containing minor discrepancies related to pill count, etc., the record reflects that Manos was repeatedly offered his medications and refused them, and there is no evidence in the record of other inmates and failure to provide them with medications. The Plaintiff attempts to assert this issue based on two complaints by Nurse Miller about medication distribution from 2013, but there is no evidence that the 2013 incidents were the result of

a custom, much less that said custom existed in 2015 at the time of Manos's death. Furthermore, although Nurse Miller complained on occasion that she had not been notified as to the reason an inmate was moved to the medical block, she *did* have access to information regarding the inmates and their medical status, including reports related to their medications.

However, the Court finds that there *is* a question of fact as to the custom regarding failing to transport inmates to the ER. In addition to the incident on November 3, 2015 when jailers refused service, the Plaintiff has provided three additional incidents from 2012 where jailers refused service: for two separate times inmates were having seizures, and once for an inmate with an ankle injury who had gotten verbally argumentative with jailers. *See* Docket No. 208, Ex. 31-33. In all those instances, jailers declined service by the EMTs. Although perhaps thin, this evidence does raise the suggestion of a possible violative custom.

Having thus addressed the first prong of the analysis, the Court turns to the second prong, requiring a deprivation of constitutional rights. The claim of constitutionally inadequate medical care, as discussed above, has both an objective and subjective component. *See Martinez*, 563 F.3d at 1088 ("The test for deliberate indifference is both objective and subjective."), *citing Callahan*, 471 F.3d at 1159. The Court has previously found that the Plaintiff has satisfied the objective component, and Defendant Bryant appears to agree that the Plaintiff has done so for purposes of this motion. The Court also finds that, in the light most favorable to the Plaintiff, the evidence would support an inference of deliberate indifference to Manos' serious medical condition when jailers

refused to allow EMTS to transport him to the ER. Accordingly, there is evidence of a constitutional violation. For these reasons, Bryant is therefore not entitled to summary judgment to the extent that the Plaintiffs' claims are predicated upon a policy, practice, or custom.

The Plaintiffs likewise contends that Bryant is liable in his official capacity for failure to train and failure to supervise, asserting that there was no training on mental health care, and that the lack of training was an "affirmative link" behind the constitutional violation. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). However, it is possible that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989).

"It is not enough, however, for [the Plaintiff] to show that there were general deficiencies in the county's training program for jailers. Rather, [she] must identify a specific deficiency in the county's training program closely related to [Mr. Manos'] ultimate injury, and must prove that the deficiency in training actually caused his jailer to act with deliberate indifference to his safety." *Lopez*, 172 F.3d at 760. Here, the Plaintiff asserts a "total failure to train and supervise," because jail staff was not provided with the policy manual or trained on medical policy requirements. Bryant responds that, even

though certain staff may have not received all required training, other jailers did and there is no evidence either were deliberately indifferent to Mr. Manos' serious medical needs as a result of this failure. "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 61. Here, the Court finds that the Plaintiff has presented sufficient evidence to demonstrate the existence of a fact question, thereby precluding summary judgment. The evidence in the record suggests three prior denials of medical care when EMTs were called to the Jail and subsequently turned away the Jail employees. Additionally, there is evidence that the policies for medical care, and supervision of inmates with mental health problems, were ignored and that Jail employees lacked knowledge of these policies and their requirements. Jail Administrator Armstrong specifically testified that he could not remember training employees on the policy for at least three years. *Dubois*, 2016 WL 1091099, at *11(finding a fact question where there was evidence Jail policies were disregarded, Jail staff "reflected a general lack of knowledge of what the policies required," and "the decision whether to call for medical attention for an inmate was entrusted solely to individual Jailers." "[P]laintiff has provided sufficient evidence supporting an inference that those policies were not enforced and there was no supervision to ensure that Jailers obtained medical care when needed. A jury could reasonably find that the need for more or different training and supervision was so obvious and the inadequacy so likely to result in the violation of inmates' constitutional rights that the county was deliberately indifferent."), *citing Canton*, 489 U.S. at 390. *Cf. Bloom v. Toliver*, 133 F. Supp. 3d 1314, 1325 (N.D. Okla. 2015) ("Even if the evidence established

deficient training of Jail staff, there is no evidence that any policymaker (including the former Sheriff) was on notice of a deficiency that caused violations of citizens' constitutional rights, and there is no evidence of a pattern of similar (alleged) constitutional violations by untrained employees or that any policymaker deliberately chose a training program that would violate inmates' rights."), *aff'd sub nom. Bloom v. Pompa*, 654 Fed. Appx. 930 (10th Cir. 2016). Accordingly, Bryant is not entitled to summary judgment as to the Plaintiff's First Claim for Relief.

## CONCLUSION

In summary, the Motion for Summary Judgment of Defendant, Deputy Brantley Maxson [Docket No. 172], the Motion for Summary Judgment of Defendant Milton Anthony and Brief in Support [Docket No. 194] and the Motion for Summary Judgment of Defendant Josh Adams and Brief in Support [Docket No. 195] are GRANTED. Defendant Sheriff Chris Bryant's Motion and Brief for Summary Judgment [Docket No. 182] is DENIED.

DATED this 17th day of April, 2019.

Steven P. Shreder
United States Magistrate Judge
Eastern District of Oklahoma