IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JEANNE BENNETT, Administrator of the Estate of Michael Manos, Deceased, <br><br> Plaintiff, <br><br> v. <br><br> CHRIS BRYANT, SHERIFF OF CARTER COUNTY, *in his official capacity*, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

                    Case No.: 17-CV-289-SPS

**PLAINTIFF'S MOTION FOR SANCTIONS FOR
DEFENDANT'S SPOLIATION OF EVIDENCE**

**COMES NOW** the Plaintiff, Jeanne Bennett ("Plaintiff"), as the Administrator of the Estate of Michael Manos ("Mr. Manos"), deceased, by and through her attorneys of record, and, respectfully moves for sanctions -- specifically an adverse inference instruction at trial and/or an order allowing the Plaintiff to question witnesses in front of the jury about the destroyed and/or missing evidence -- for Defendant's spoliation of video evidence. In support of this Motion, Plaintiff shows the Court the following:

**Introductory Statement**

The issue before this Court is:

Whether Defendant's destruction of and/or failure to preserve video footage from at least four surveillance cameras that monitor the cells/areas of the Carter County Detention Center ("CCDC" or "Jail") in which Mr. Manos was housed constitutes sanctionable spoliation.

As shown below, the evidence of spoliation in this matter is alarming. Making matters worse, it was seasoned law enforcement officials, who admittedly knew the value and importance

1

of the video evidence at issue, who disposed of/negligently failed to preserve the video evidence in this case. This constitutes sanctionable conduct.

This is a civil rights involving the horrific death of Mr. Manos due to the deliberate indifference of the staff at the CCDC. Staff at CCDC consistently denied Mr. Manos, who suffered from severe bipolar disorder, his vital psychotropic medications for weeks while he fell into psychosis and, eventually, a catatonic state. After lying on his cell floor for weeks, completely immobile and covered in his own feces, Mr. Manos succumbed to a pulmonary embolism. In such a case, any video evidence is vital and potentially dispositive in resolving the issues. The integrity of such evidence is paramount to the Court's, and ultimately the jury's, search for truth and justice. Unfortunately, due to the spoliation, there are fundamental questions about the lack of video evidence in this matter. Jails typically have comprehensive surveillance systems. Yet, shockingly, Defendant has preserved no video evidence of the events of this case. Defendant should not benefit from its own failure to properly preserve the evidence as well as its possible intentional destruction of such evidence. On the contrary, the Court should impose an appropriate sanction in the form of an adverse inference jury instruction at trial and/or and order permitting the Plaintiff to question witnesses in front of the jury about the missing and/or destroyed evidence.

## Background

On July 25, 2017, Plaintiff filed her Complaint (Dkt. #2). She filed an Amended Complaint (Dkt. #18) on August 28, 2017 and a Second Amended Complaint (Dkt. #51) on October 5, 2017. In her Second Amended Complaint, Plaintiff alleges that Jail staff was deliberately indifferent to Mr. Manos' obvious medical needs, and further that CCDC's medical delivery system was woefully inadequate. Through discovery, Plaintiff obtained extensive evidence of the events leading up to Mr. Manos' death, including jail entry logs, medication logs, emergency medical

technician ("EMT") reports and an Oklahoma State Bureau of Investigation ("OSBI") report. However, notably, Defendants did *not* product *any* video of Mr. Manos while he was housed at the Jail.

When Mr. Manos entered the Jail on October 22, 2015, his mental state was unstable, but had not yet deteriorated too severely. Mr. Manos' condition was easily controlled by the precise regimen of drugs prescribed by his psychiatrist. As jailers consistently denied Mr. Manos his medications, his mental state sharply declined. Mr. Manos ceased to nourish or hydrate himself and lost his ability to speak. He defecated on the floor of his cell, took off all of his clothes, and smeared the feces on himself and all around the cell. Eventually, in a state of severe psychosis, Mr. Manos began to eat the feces. Mr. Manos laid on the floor of his cell covered in his own feces for weeks until he succumbed to his serious medical ailments.

No one at the Jail ever offered Mr. Manos any form of medical or psychiatric treatment, despite knowing the extent of his condition. Just days before Mr. Manos died, on November 3, 2015, jailers called an ambulance because they believed Mr. Manos was suffering from low blood sugar. Once the paramedics from the Southern Oklahoma Ambulance Services ("SOAS") arrived and determined that Mr. Manos' blood sugar was under control, Jail staff refused Mr. Manos service to the Emergency Room, without his consent, despite the fact that he was lying in his own waste and unable to carry on coherent conversation. When the jailers called SOAS, they also called the Jail Administrator, Michael Armstrong. As part of the discovery process, counsel for Plaintiff took Armstrong's deposition. Armstrong testified that upon his arrival to the Jail, he witnessed two jailers dragging a naked Mr. Manos to the shower on a pair of orange linens. Armstrong Depo. (Ex. 1) at 23:19 – 24:22. Mr. Armstrong also testified that there are two cameras on A-Block, the area in the Jail where Mr. Manos was housed at the time of this incident, that should have captured

these events event. *Id.* at 24:23 – 25:13. Armstrong also noted that there was a camera that monitors the hallway leading up to A-Block. *Id.* Finally, Armstrong testified that there are cameras that monitor the holding cells in which Mr. Manos was confined at various times during his stay at CCDC. *Id.* at 104:18-22. Importantly, however, Armstrong never viewed any of the surveillance footage, ***nor did he take any steps to preserve the video***. *Id.* at 29:13 – 30:8. Armstrong admitted that video footage would have been the best evidence to evaluate the jail staff's treatment (or lack thereof) of Mr. Manos. *Id.* at 30:14 – 31:10. Further, Armstrong was familiar with the video preservation process, and had, in fact, requested the preservation of footage in the past. *Id.* at 35:11 – 36:7. He also knew that Jail video was typically destroyed after 30 days. *Id.* at 34:4-6. Puzzlingly, it allegedly never dawned on Armstrong to preserve any video footage related to Mr. Manos.

After Mr. Manos died, the Sheriff at the time, Milton Anthony, called OSBI to report the suspicious death. Anthony Depo. (Ex. 2) at 94:22-24. Anthony, who had a long career in law enforcement, ***understood that he had an obligation to preserve any and all evidence as part of the ongoing investigation*** into Mr. Manos' death. *Id.* at 97:23 – 98:1. Yet, Anthony ***took no steps to preserve the video footage***, and even attempted to blame the video's destruction on Armstrong and/or the OSBI. *Id.* at 98:2 – 99:1. Additionally, Armstrong testified that Anthony never asked him to preserve any surveillance video. Armstrong Depo. (Ex. 1) at 33:5-7.

Anthony was also familiar with the video preservation process at CCDC. In November of 2013, Defendant Chester Carter was disciplined for negligently leaving a bottle of medication in an inmate's cell. During that disciplinary process, Anthony testified that he had Armstrong pull the surveillance video from the inmate's cell in order to determine whether Carter's actions warranted punishment. Anthony Depo. (Ex. 2) at 131:7 – 132:22. Yet in the case of Mr. Manos,

Anthony neither took the initiative to ensure the preservation of the video nor did he instruct Armstrong to do so.

After nearly a year of litigation and extensive discovery, the remaining Defendants in this case, Josh Adams, Brantley Maxson, Milton Anthony, and Chris Bryant (in his official capacity as Sheriff of Carter County, OK) filed motions for summary judgment. *See* Dkt. ## 195, 172, 194, and 182. On April 17, 2019, the Court granted Defendants Adams, Maxson and Anthony's motions for summary judgement, and denied Defendant Bryant's motion for summary judgement. Dkt. #243. On April 25, 2019, the Court entered the Second Amended Scheduling Order (Dkt. #246), which set a trial date for August 21, 2019.

As Plaintiff prepares for trial, she respectfully asks this Court to issue spoliation sanctions.

## Discussion

### A. Applicable Legal Standards Regarding Spoliation Sanctions

Federal Courts possess certain inherent powers, "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.*, 82 S.Ct. 1386, 1389 (1962). Included in these powers is "the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.,* 111 S.Ct. 2123, 2133 (1991). "A spoliation sanction is proper where: '(1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence.'" *Jones v. Norton*, 809 F.3d 564, 580 (10th Cir. 2015) (quoting *Turner v. Pub. Serv. Co. of Colorado*, 563 F.3d 1136, 1149 (10th Cir.2009)). Courts generally consider a number of factors when deliberating whether to impose sanctions for the spoliation of evidence, including, "(1) the degree of actual prejudice to the [party]; (2) the amount of interference with the judicial

process;...(3) the culpability of the litigant." *Ehrenhaus v. Reynolds,* 965 F.2d 916, 921 (10th Cir. 1992) (quoting *Ocelot Oil Corp. v. Sparrow Indus.,* 847 F.2d 1458, 1465 (10th Cir. 1988) (internal citation omitted).

"As a general rule, the 'bad faith destruction of a document relevant to proof of an issue at trial gives rise to an inference that production of the document would have been unfavorable to the party responsible for its destruction.'" *E.E.O.C. v. Dillon Companies, Inc.*, 839 F. Supp. 2d 1141, 1144 (D. Colo. 2011) (quoting *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir.1997)).

However, the negligent loss or destruction of evidence may still warrant imposition of lesser sanctions, "so long as the party seeking sanctions can show it suffered prejudice and the other side was on notice that the evidence should be preserved." *Browder v. City of Albuquerque*, 209 F. Supp. 1236, 1244 (D.N.M. 2016).

The nature of the appropriate sanction in any case "is a question peculiarly committed to the district court." *Dillon v. Nissan Motor Co.*, 986 F.2d 263, 268 (8th Cir. 1993). The Tenth Circuit has noted that the district courts "have 'substantial weaponry' in their arsenal to shape the appropriate relief for spoliation." *Helget v. City of Hays, Kansas*, 844 F.3d 1216, 1225 (10th Cir. 2017) (quoting *Turner*, 563 F.3d at 1149). In this regard, spoliation sanctions may include, for example, "an award of attorney fees; an order that the culpable party produce related documents regardless of any claims of privilege or immunity; excluding evidence or striking part of a party's proof; allowing the aggrieved party to question a witness in front of the jury about the missing evidence; and imposing costs for creating a substitute for spoliated data." *Browder*, 209 F. Supp. 3d at 1244. "Sanctions for spoliation serve three distinct remedial purposes: punishment, accuracy, and compensation," and may also be "designed to promote

accurate fact finding by the court or jury." *U.S. ex rel. Koch v. Koch Indus., Inc.*, 197 F.R.D. 488, 490 (N.D. Okla. 1999).

   B. **A Spoliation Sanction is Warranted in this Case**

   1. **CCDC Had a Duty to Preserve the Video Evidence**

There is no genuine dispute that CCDC had a duty to preserve the video evidence, as Anthony acknowledged this duty in his deposition. *See* Anthony Depo. (Ex. 2) at 97:23 – 98:1, 279:15-282:6. Anthony also recognized that OSBI would be investigating Mr. Manos' death and that video evidence would be helpful to that investigation. *Id.* at 96:6-17. Both Anthony and Armstrong were aware that in the event of a suspicious jail death, they had a duty to notify OSBI, as they both have participated in similar OSBI investigations in the past.

For example, On April 12, 2011, an inmate named Patricia Wallace died while in custody at CCDC, and the related OSBI report indicates that Armstrong produced the relevant surveillance footage for OSBI Agent David Seals. *See* OSBI Report for Patricia Wallace (Ex. 3) at 6. On October 4, 2013, another inmate at CCDC, Jackie Dee Perkins, died while in custody at the Jail. Anthony, who was Undersheriff at the time, called OSBI to report the suspicious death. Cooperating with OSBI's investigation, Armstrong gave Agent Seals – who was the responding Agent in this instance as well – copies of his own jail reports, which included two DVDs of Cell Block B video monitor footage. OSBI Report for Jackie Perkins (Ex. 4) at 5. On August 19, 2015, an inmate named Everett Aaron Park committed suicide while in custody in a holding cell at CCDC. Anthony called OSBI to report the death and request assistance. OSBI Report for Everett Park (Ex. 5) at 2. Detention Officers Donny Raley and Ryan Collier gave OSBI Special Agents Mark Wood and Justin Brown surveillance footage from inside Mr. Park's cell and from the hallway just outside of his cell. *Id.* at 15, 25. On June 30, 2016, just seven months after Mr. Manos'

death, another inmate at the Jail, Wayne Bowker, died under startlingly similar circumstances. Mr. Bowker had also descended into a catatonic state, was smearing feces on himself, and was not receiving his prescribed medications. Armstrong reported Mr. Bowker's death to OSBI, and provided OSBI surveillance footage from the day before Mr. Bowker's death. Wayne Bowker OSBI Report (Ex. 6) at page 73/84.  By contrast, here, despite recognizing that Mr. Manos' death was suspicious and calling upon the OSBI to investigate, the Carter County Sheriff's Office ("CCSO") failed to preserve the video evidence of Mr. Manos.

Additionally, just by the very nature of Mr. Manos' death, any reasonable sheriff's office would recognize that an investigation, as well as civil litigation, were likely forthcoming. Indeed, "[t]he general rule is that '[o]nce a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a litigation hold to ensure the preservation of relevant documents.'". *U.S. ex rel. Baker v. Community Health Systems, Inc.,* 2012 WL 12294413, at *2 (D.N.M. 2012) (quoting *Zubulake v. UBS Warbug LLC,* 220 F.R.D. 212, 218 (S.D.N.Y. 2003) (internal quotation marks omitted). Anthony and Armstrong, experienced law enforcement officers who had participated in numerous investigations into the injury and/or deaths of inmates at the Jail, knew that video evidence would be the best type of evidence in a case such as Mr. Manos', yet neither of them did ***anything*** to ensure the preservation of surveillance footage from ***any of the multiple cameras*** that would have captured Mr. Manos' movements and activities (or lack thereof). Armstrong Depo. (Ex. 1) at 30:14 – 31:10; Anthony Depo. (Ex. 2) at 97:11-22.

   **2. The Video Evidence is Relevant**

While there is an abundance of evidence of deliberate indifference to Mr. Manos' obvious serious medical conditions in the form of witness testimony, medication logs, jail incident reports, and jail entry logs, it is clear that video evidence would be crucial in helping to resolve any factual

8

disputes in this case. For instance, it is undisputed that Mr. Manos was given very few of his prescribed medications from starting on October 28, 2015, and from November 1 until his death on November 7, 2015, he received none of them. *See*, *e.g.,* Dkt. #208 at LCvR 56.1(c) Statements(A)(4,8). However, Defendants allege that on some of those occasions, Mr. Manos was offered, but actively refused, his medications. *See*, *e.g.*, Dkt. #182 at LCvR 56.1(b) Statements(A)(4 - 10).[1] Footage from any one of the many cameras at the Jail would serve to clear up any discrepancies in the evidence.

Additionally, video footage would help clear up any questions regarding the conditions of Mr. Manos' cell, specifically when, if ever, it was cleaned. Defendants claim that Mr. Manos' cell was cleaned by trustees on November 3, 2015, while Plaintiff disputes this fact. *Compare* Dkt. #182 at LCvR 56.1(b) Statement(A)(27) to Dkt. #208 at LCvR 56.1(c) Statement(A)(27). Video evidence indicating that Mr. Manos' cell was rarely, if ever, cleaned would be crucial to Plaintiff's conditions of confinement claim. *See, e.g.,* Dkt. #246 at 30.

Finally, Richard Ayers, a CCDC detention worker and former defendant in this case, offered testimony that is suspiciously inconsistent with the vast evidentiary record of this case with regards to Mr. Manos' condition on November 7, 2015, the day of his death. Ayers testified that he spoke with Mr. Manos, who was walking around his cell, on November 7, and that there was no feces on Mr. Manos' body or in his cell, despite the fact that photos of Mr. Manos' cell just

---

[1] Indeed, the issue of medication administration likely played an important role in the Court's decision to grant summary judgment with respect to Defendants Adams, Maxson, and Anthony. *See, e.g.,* Dkt. #243 at 19 ("Here, Manos was repeatedly offered his medications and food trays...The Court therefore finds there is no clearly established law that there is a constitutional requirement of consulting a medical or mental health professional where an inmate had twice previously been cleaned up after rolling around in feces and also refused medications and some (but not all) meals."); *Id.* at 26 ("However, even if that was a deficiency for which Anthony had been made aware, the evidence reflects that Manos *was* offered his medications but refused them.").

hours after this supposed interaction show that it was covered in feces. *Compare* Dkt. #182 at LCvR 56.1(b) Statements(A)(37) with Dkt. #208 at LCvR 56.1(c) Statement(A)(27). Video evidence would be likely to objectively prove or disprove Officer Ayers' contentions.

### 3. Plaintiff is Prejudiced by the Lost and/or Destroyed Evidence

A party alleging spoliation satisfies the prejudice element by establishing a "reasonable possibility . . . that access to the lost material would have produced evidence favorable to [its] cause." *E.E.O.C. v. Dillon Cos.*, 839 F. Supp. 2d 1141, 1144-45 (D. Colo. 2011). Plaintiff easily meets this threshold. As stated above, Anthony and Armstrong were fully aware of their duty to preserve any surveillance footage, were aware of the preservation process and had participated in numerous other OSBI investigations in which CCSO produced video footage. It is clear that the video, in its original format, has been lost forever due to blatant incompetence and misconduct. Defendant's failure to preserve the video, when CCSO had ample experience preserving evidence for similar investigations (albeit in cases without such obvious evidence of CCSO misconduct), strongly suggests that the lost video would have produced evidence favorable to Plaintiff. Neither Anthony nor Armstrong have offered any explanation as to why the footage was not preserved.

Further, the fact that the video no longer exists has made it impossible for Plaintiff to adequately dispute various pieces of testimony offered by current and former Jail detention workers. As discussed in section B(2), *supra*, former detention workers Adams and Maxson claim that they always offered Mr. Manos his medications and food trays, but that he simply refused. The circumstantial evidence indicates that that may not have been the case, but only video evidence could conclusively confirm or disprove that testimony. The same goes for Ayers' testimony that conflicts with nearly every piece of evidence discovered in this case. Plaintiff has been prejudiced in the sense that witnesses like Adams, Maxson, and Ayers are free to offer self-serving testimony,

knowing that there would be no video evidence to dispute their claims. More generally, contemporaneous video evidence would be the best and most objective evidence of Mr. Manos' conditions of confinement, as opposed to reliance upon second-hand and after-the-fact witness accounts. It is axiomatic that the spoliation of such evidence is highly prejudicial to Plaintiff's case.

**4. There is a High Degree of Culpability**

As summarized throughout this brief, the failure to properly preserve the video evidence in this matter certainly involved a high degree of carelessness. However, it was more than that. Considering Anthony's and Armstrong's vast experience in law enforcement and assisting in investigations, their failure to preserve video evidence is beyond suspicious. As soon as Mr. Manos' death was reported to OSBI, either Anthony or Armstrong should have immediately ensured that all video footage be preserved. As previously noted, both Anthony and Armstrong had participated in several other OSBI investigations in which they had obtained provided relevant surveillance footage on DVDs. And even if the Court finds that there is no evidence of bad faith, the spoliation was not the result of mere negligence, but clearly falls higher up on the "continuum of fault." *Browder*, 209 F. Supp. at 1244. Evidence of obvious relevance that CCSO itself created and was in its sole custody was not preserved or possibly intentionally destroyed. There is a degree of culpability here worthy of a spoliation sanction.

WHEREFORE, for the reasons set forth above, Plaintiff respectfully requests spoliation sanctions against Defendants, specifically an adverse inference instruction at trial and/or an order allowing the Plaintiff to question witnesses in front of the jury about the missing and/or destroyed evidence.

    Respectfully,

    /s/ Robert M. Blakemore
    Daniel Smolen, OBA #19943
    Robert M. Blakemore, OBA #18656
    Bryon D. Helm, OBA #33003
    Smolen & Roytman
    701 South Cincinnati Avenue
    Tulsa, OK 74119
    Phone: (918) 585-2667
    Fax:    (918) 585-266

    ***Attorneys for Plaintiff***

## CERTIFICATE OF SERVICE

    I hereby certify that on the 8th day of July 2019, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to all ECF registrants who have appeared in this case.

    /s/ Robert M. Blakemore